# IN THE UNITED STATES COURT OF APPEALS
## TENTH CIRCUIT

---

UNITED STATES OF AMERICA,　　　　)
　　　　　　　　　　　　　　　　　)
　　　　　　　　Plaintiff/Appellee,　　)
　　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　　)　　　　Case No. 23-6204
　　　　　　　　　　　　　　　　　)
ADONIS BATISTA,　　　　　　　　　)
　　　　　　　　　　　　　　　　　)
　　　　　　　　Defendant/Appellant.　)

---

## OPENING BRIEF OF DEFENDANT/APPELLANT

---

Appeal from the United States District Court
for the Western District of Oklahoma
The Honorable Patrick R. Wyrick
United States District Judge
D.C. No. CR-22-00374-PRW-1

David Autry, OBA #11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
(405) 521-9600
(405) 521-9669 [fax]
dbautry77@gmail.com

Lawyer for Defendant/Appellant,
Adonis Batista

ORAL ARGUMENT REQUESTED
Digital/Scanned Documents Attached
June 5, 2024

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES..................................................................................iii

PRIOR OR RELATED APPEALS.........................................................................1

PARTIES TO THE PROCEEDINGS......................................................................1

STATEMENT OF JURISDICTION.......................................................................1

STATEMENT OF THE ISSUES...........................................................................1

STATEMENT OF THE CASE..............................................................................2

STATEMENT OF THE FACTS............................................................................  2

SUMMARY OF THE ARGUMENTS....................................................................17

**ARGUMENT**

**I.  AT A MINIMUM RESENTENCING IS NECESSARY.  THE TRIAL COURT COMMITTED PROCEDURAL ERROR BY IGNORING THE JURY'S AFFIRMATIVE VERDICT ON DRUG QUANTITY AND PLACING THE BASE OFFENSE LEVEL AT FAR HIGHER THAN IT SHOULD HAVE BEEN.** THE FAILURE TO ADHERE TO THE JURY'S DETERMINATION OF DRUG QUANTITY VIOLATED DEFENDANT'S SIXTH AMENDMENT RIGHT TO A JURY TRIAL AND HIS FIFTH AMENDMENT DUE PROCESS RIGHTS..........................................................................  18

Standard of Review..............................................................................................18

Portion of the record where the issue was raised and ruled upon...........................19

Discussion...........................................................................................................19

**II.  DEFENDANT'S CONVICTION SHOULD BE REVERSED BECAUSE THE TRAFFIC STOP WAS EXTENDED ILLEGALLY TO OBTAIN STATEMENTS AND TO SEIZE HIS CELL PHONES.  IN ADDITION, THERE WAS NO PROBABLE CAUSE TO LATER AUTHORIZE SEARCH OF THE CONTENTS OF THE PHONES............................................................28**

Standard of Review...........................................................................................28

Portion of the record where the issue was raised and ruled upon........................... 29

Discussion...........................................................................................29

CONCLUSION........................................................................................36

STATEMENT REGARDING ORAL ARGUMENT.............................................36

CERTIFICATE OF MAILING AND ELECTRONIC SERVICE..........................37

CERTIFICATE OF DIGITAL SUBMISSIONS....................................................37

CERTIFICATE OF COMPLIANCE.......................................................................38

**ATTACHMENTS**

JUDGMENT IN A CRIMINAL CASE

NOTICE OF APPEAL

## TABLE OF AUTHORITIES

**PAGE**

**Cases:**

*Apprendi v. New Jersey,* 530 U.S. 466, 481 (2000)...........................................22, 23

*Berkemer v. McCarty,* 468 U.S. 420 (1984)...........................................................31

*Brown v. Illinois,* 422 U.S. 590 (1975)..................................................................34

*Delaware v. Prouse,* 440 U.S. 648 (1979)..............................................................30

*Florida v. Royer,* 461 U.S. 491 (1984)..................................................................31

*Gall v. United States,* 522 U.S. 38 (2007)........................................................18, 19

*McClinto n v. United States,* 600 U.S.___, No. 21-1557 (cert. denied, June 30, 2023).............................................................................25

*Rodriguez v. United States,* 575 U.S.___, 135 S.Ct. 1609 (2015).........................31

*Terry v. Ohio,* 392 U.S. 1 (1968)..........................................................................30

*United States v. Botero-Ospina,* 71 F.3d 783 (10th Cir. 1995)(en banc)...........30, 32

*United States v. Caro,* 248 F.3d 1240 (10th Cir. 2001)....................................31, 32

*United States v. Chavira,* 467 F.3d 1286 (10th Cir. 2006)......................................33

*United States v. Durham,* 902 F.3d 1180 (10th Cir. 2018)......................................18

*United States v. Elliott,* 107 F.3d 810 (10th Cir. 1997)...........................................32

*United States v. Friedman,* 554 F.3d 1361 (10th Cir. 2009)....................................18

*United States v. Gunn,* No. 21-6128, 2023 WL 2808108 (10th Cir. 2023).............27

*United States v. Guzman,* 864 F.2d 1512 (10th Cir. 1988)......................................32

*United States v. Holt,* 264 F.3d 1215 (10th Cir. 2001)(en banc)......................31, 33

*United States v. Hunnicut,* 135 F.3d 1345 (10th Cir. 1998)....................................30

*United States v. Keck,* 643 F.3d 789 (10th Cir. 2011)..............................................27

*United States v. Leon,* 468 U.S. 897 (1984)..............................................................36

*United States v. Magallanez,* 408 F.3d 672 (10th Cir. 2005)..................................23

*United States v. Martinez-Barragan,* 545 F.3d 884, 898 (10th Cir. 2008)..............18

*United States v. McClinton,* 23 F.4th 732 (7th Cir. 2022)........................................26

*United States v. Nava-Ramirez,* 210 F.3d 1128 (10th Cir. 2000)............................33

*United States v. Pimental-Lopez,* 828 F.3d 1173 (9th Cir. 2016),
*amended, and rehearing en banc denied,* 859 F.3d 1134 (9th Cir. 2017.........passim

*United States v. Sandoval,* 29 F.3d 537 (10th Cir. 1994)........................................32

*United States v. Venezia,* 995 F.3d 1170 (10th Cir. 2021)......................................29

*United States v. Villa-Chapparo,* 115 F.3d 797 (10th Cir. 1997)...........................32

*United States v. Watts,* 519 U.S. 148 (1997)(per curiam)...............23, 24, 25, 26, 27

*Wong Sun v. United States,* 371 U.S. 471 (1963)....................................................34

**Constitutional Provisions**

U.S. Const. Amend. IV.....................................................................................28, 30

U.S. Const. Amend. V...........................................................................................28

U.S. Const. Amend. VI..........................................................................................28

**Statutes:**

28 U.S.C. § 1291....................................................................................1

18 U.S.C. § 3742....................................................................................1

**Federal Rules:**

Fed.R.App.P. 4(b)(1)..............................................................................1

**Sentencing Guidelines:**

USSG § 2D1.1(9)..................................................................................20

**UNITED STATES COURT OF APPEALS**
**TENTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff/Appellee, | ) | |
| | ) | No.  23-6204 |
| v. | ) | No. CR 22-374-PRW-1 |
| | ) | (lower docket) |
| ADONIS BATISTA, | ) | |
| | ) | |
| Defendant/Appellant. | ) | |

**PRIOR OR RELATED APPEALS**

There are no prior or related appeals with respect to this case or Mr. Batista.

**PARTIES TO THE PROCEEDINGS**

The United States is the Plaintiff/Appellee.  Adonis Batista, an individual, is the Defendant/Appellant.

**STATEMENT OF JURISDICTION**

This is a direct appeal taken under the authority of Fed.R.App.P. 4(b)(1). This Court has jurisdiction under 28 U.S.C § 1291 and 18 U.S.C. § 3742.

**STATEMENT OF THE ISSUES**

1.  In fixing the advisory guideline range and in determining the appropriate sentence, was the district court bound by the jury's affirmative finding beyond a reasonable doubt  that Mr. Batista was accountable for less than 50 grams of a

1

mixture or substance containing methamphetamine?

2. Did Mr. Batista's detention and questioning during a traffic stop violate the Fourth and Fifth Amendments? Were his cell phones seized and searched illegally \without probable cause?

## STATEMENT OF THE CASE

References to the record will be "ROA" followed by the volume and page number. Volume I contains publicly filed documents. Volume II consists of sealed filings, such as the initial and final presentence reports. Volume III consists of publicly filed transcripts, including a partial motion hearing transcript (M.Tr.), the trial transcript (Tr.) and the transcript of the sentencing hearing (S.Tr.). Volume IV consists of a conventionally filed video exhibit of a traffic stop involving Mr. Batista.

By an indictment filed on September 6, 2022, Mr. Batista and others were charged in a single count with conspiracy to distribute and to possess with intent to distribute 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine.[1] It was alleged the conspiracy lasted from sometime in July 2022 to August 18, 2022. (ROA Vol. I pp. 12-14, 19-21) Mr.

---

[1] Defendant was charged along with Malcolm Costa, Brayan Aguilar-Aguilar, Oscar Rodriguez-Reyes, Jose Rosas, and Mario Marrero. Each of Mr. Batista's co-defendants pleaded guilty.

Batista was detained pending trial.  (ROA Vol. I p. 32)

Defendant filed several pretrial motions, including a motion to suppress his statements to law enforcement and the information gleaned from two cell phones seized from him during questioning, and a motion to dismiss because of the delay in arraigning Mr. Batista in the Western District of Oklahoma.   (ROA Vol. I, pp. 33-66, 67-194, 210-233).

Mr. Batista went to jury trial.  He was convicted as charged.  The jury had difficulty reaching a verdict, and deliberated a considerable period of time for a relatively short trial.  (ROA Vol. I pp. 243-247, ROA Vol. II pp. 27-34)  In a special interrogatory, the jury found, beyond a reasonable doubt, that Defendant was responsible or accountable for less than 50 grams of a mixture or substance containing methamphetamine.  The jury rejected the government's case that Mr. Batista was accountable for 500 or more grams of the drug.  Likewise, the jury found Defendant was not accountable for between 50 and 500 grams of methamphetamine.  (ROA Vol. I pp. 243-247, 281-283)

Based on the jury's verdict, the statutory punishment range was 0 to 20 years imprisonment.  Had the jury found the drug quantity charged in the indictment, the statutory punishment  range would have been a mandatory minimum of 10 years, and up to life.  Had the jury found Defendant was

responsible for between 50 and 500 grams of methamphetamine, the punishment range would have been 5 to 40 years.  (ROA Vol. II pp. 77-78)

At sentencing, the district court rejected Mr. Batista's argument that it was bound by the jury's verdict on drug quantity.  In accordance with the findings of the Probation Office, the district court fixed the base offense level at 38, instead of 22, as Defendant argued.  (S.Tr.  4-12)   A number of special offense characteristics were found, also in line with the conclusions of the Probation Office, and over objection.[2]  An objection was sustained to designating Mr. Batista a "leader" of the enterprise.   (ROA Vol. II pp. 86-87, 113-121, S.Tr. pp. 13-25) The total offense level was 47, reduced to 43, the highest level under the advisory guidelines.  The court found Mr. Batista was in criminal history category VI. Because the statutory maximum for the offense of conviction was 20 years, Defendant was sentenced to 240 months imprisonment, along with three years of supervised release and a $100.00 special assessment.  (*E.g.,* S.Tr. pp. 37-50)

A timely notice of appeal was filed.  (ROA Vol. I pp. 470-471)

## STATEMENT OF THE FACTS

---

[2] Two levels each were added because the methamphetamine was imported from Mexico; for maintaining a drug-involved premises; and obstruction of justice.  Three levels were added for risk of harm, because the Del City residence in which the conversion lab was located caught fire and required the response of emergency personnel.  (ROA Vol. II pp. 85-87, S.Tr. pp. 13-25)

4

On July 16, 2022, a house located at 3120 Beechwood Drive in Del City, Oklahoma[3] caught fire.  The local fire department responded.  No one was located in the house.  (Tr. 43)  The DEA was called after a methamphetamine "conversion" lab was discovered within the residence.  All told, 36 gallons of liquid methamphetamine and 677 grams of "finished" crystal methamphetamine, with an approximate purity level of 95%, were discovered.  Equipment for converting liquid to crystal methamphetamine was also found within the residence.  (Tr. 50, 52, 225-226, 230-32, 236, 238, 240-41, 246-47, 251, 254, ROA Vol. II pp. 83-85, Gov't Exhs. 1-6, 13, 32-33, 36-37, 40-41)

A number of documents in Mr. Batista's name were found on a windowsill of the house.  These included a Florida identification card, two bank cards, and a T-Mobile cell phone receipt or bill.  (Tr. 55-56, Gov't Exhs. 7-12)  Identification for at least one other of the charged co-conspirators, Malcolm Costa, was also found.  (Tr. 56, Govt's Exhs. 9-10)  Among other items discovered were a veterinary bill and a Wal-Mart receipt.  (Tr. 59-60, Gov't Exh. 15)  The authorities were able to trace the vet bill to co-defendant Mario Marrero.  (Tr. 59)  Based on the Wal-Mart receipt, dated July 10, 2022, surveillance video from the Del City store was acquired.  A still photograph was isolated from the video, showing Mr.

---

[3]  Del City is a contiguous suburb of Oklahoma City.

5

Batista and co-defendants Costa and Marrero entering the store.  (Tr. 61, Gov't Exh. 14)

On July 25, 2022, the Del City fire chief informed the DEA that one of the individuals seen in the surveillance video/photograph (later identified as Mr. Batista) had been spotted entering the Del City Wal Mart.  (Tr. 62)  The DEA set up physical surveillance, and eventually followed Defendant to a Pet Smart store in Norman, Oklahoma.  (Tr. 62-63)  There, he was observed meeting with two people (Marrero and Costa), who arrived in a Ford truck.   Mr. Batista took a large white bag from the truck and placed it in his vehicle.  Another container was given by Defendant to Marrero and Costa.  (Tr. 72-74)

Defendant eventually departed, and began driving south on I-35.   DEA agents contacted the Oklahoma Highway Patrol to make a traffic stop on Mr. Batista.  (Tr. 62-63)  The DEA agents who witnessed the exchange of containers or bags at the Pet Smart believed there had been an exchange of drugs and money. This was not the case.  As matters developed, the white bag Defendant placed in his car contained only his clothing. He had no large amounts of cash.  (Tr. 73-75) At trial, Mr. Batista testified he gave Marrero his own clothing that had been washed at an Airbnb in Oklahoma City.  Defendant testified also that he gave Marrero and Costa a bottle of liquor.  (Tr. 454)

6

As directed by the DEA, Oklahoma Highway Patrol Trooper Zane Shores made a traffic stop of Defendant near Ardmore, Oklahoma. Mr. Batista supposedly violated the traffic laws by driving in the left lane of I-35 south without using it only as a passing lane. (ROA Vol. I pp. 37-44) A warning, but not a ticket was issued, even though Defendant was driving without a license. (ROA Vol. I p. 40)

When questioned by Trooper Shores, Defendant explained he was from Florida and was driving to Dallas to meet a girlfriend. He said he had been "abandoned" by his friends in Oklahoma. Mr. Batista told Trooper Shores that he was a rapper. (E.g. Tr. 455-456, ROA Vol. I p. 40) Defendant gave consent to search his vehicle. (Tr. 74, 455) The only quasi-illicit substance found was a personal use quantity of marijuana. (ROA Vol. I pp. 40-41) As noted, the white bag the authorities suspected was brimming with drugs, drug money, or both, contained only Mr. Batista's clothing. Defendant had little or no money. (Tr. 74-76, 100, 176, 455)

The traffic stop was extended so Defendant could be interrogated by DEA Agents Jeremy Epp and Sean Lively, who arrived at the scene of the traffic stop and questioned Mr. Batista in their government vehicle. (Tr. 62-63, 65-66, ROA Vol. I 33-44, 49-51) The interview was not recorded, though it easily could have

7

been.  (Tr. 83-84, 183-184)  Mr. Batista said he knew Mario Marrero in Florida.

They had been in jail together.  (Tr. 421, 481)  Marrero offered Defendant

$5,000.00 to drive him to Oklahoma City.  (The DEA reported that the price

Defendant discussed was $3,000.00.)  (Tr. 103, 126, 422, 472, 475)

 According to Agent Epp, Mr. Batista said he arrived in Oklahoma on July 6.

(Tr. 103)  Defendant denied saying this.  He told the agents he got to Oklahoma on

June 30 or July 1.  July 6 was the date co-defendant Malcolm Costa flew to

Oklahoma from Florida.  (Tr. 427)  Shown the surveillance photo from Wal-Mart,

Mr. Batista identified himself, Marrero (a/k/a "Sicario") and Costa (a/k/a "Vibe").

(Tr.  103-104, Gov't Exh. 14)   Defendant said he left the Beechwood Drive

address after one night, because he did not like the smell or atmosphere of the

place.  (105, 186-87)  Mr. Batista later stayed at an Airbnb, but had no receipt or

other proof of his occupancy there, per the agents.   Defendant  told the DEA

agents he did not know how documents and identification in his name or with his

image were left at the Beechwood Drive residence, and said nothing about losing

his wallet, although this is what he told the highway patrol  trooper.  (Tr.  105,

439)

 Defendant recalled there were Santa Muerte candles at the Beechwood

Drive residence.  Marrero worked for a Mexican who drove a white truck.  On one

occasion, Mr. Batista saw red gas cans or containers being removed from a truck and taken into the house.  After the Beechwood house fire, Defendant  and a co-defendant were robbed at a house on N.W. 26th Street in Oklahoma City.  (Tr. 106, 185-186, 189)

Defendant told the DEA agents that earlier that very day (July 25), he had talked to the "DEA" on the phone, and reported on the Beechwood Drive drug operation.  It was actually the Oklahoma Bureau of Narcotics and Dangerous Drugs (OBNDD) that was contacted.  (Tr. 107, 455-456)  Mr. Batista called law enforcement because the others were not "righteous people."  They were going to leave a dog to die in the house fire .   Defendant had to rescue the dog.   (Tr. 456)

The telephone calls were confirmed by OBN Agent Hayley Cisper.  Posing as someone named "Bill," Mr. Batista told her  about the Beechwood Drive operation, with which Agent Cisper had some familiarity.  Defendant provided names or nicknames of some of the participants, as well as phone numbers, and the specific address of the Beechwood Drive house.  "Bill" called again the next day and left a message, asking for the phone numbers he had given the previous day. There was no call back.  (Tr.  181-182, 514-518)

For his part, Mr. Batista testified at trial that he told the DEA agents information about the Beechwood Drive operation, phone numbers, and the like,

9

similar to what he had imparted to the OBNDD.   He also gave them the address in Ardmore that the others had moved to after leaving Oklahoma City.  (Tr.  457) According to Defendant, the DEA agents distorted what he told them, and misled him by saying that a person died or had possibly died in the house fire.  (Tr. 459) The agents started accusing him of lying, and threatened a 30 year prison sentence.  Mr. Batista claimed also that the agents offered to pay him money to work for them.  (Tr.  459)

The DEA agents seized Defendant's two cell phones when he refused consent to search.  A warrant to search the contents of the phones was sought the next day from an Oklahoma County state judge, and was duly issued.  (Tr. 108-109)  Although it was termed a "difficult decision," the DEA, rather than arrest Mr. Batista, let him proceed on his way to Dallas, and then Florida, after the roadside interrogation.  The investigation was "continuing," and an arrest of Mr. Batista at the time could have adversely affected it, at least according to the DEA. (Tr. 92, 95-96, 195-196)

A  number of text messages from and to Mr. Batista's phones were introduced in evidence.  Among them were texts, purportedly from Defendant, where he talked about having a job if a friend wanted one; being "owned by the Mexicans"; working for "CJNG," a Mexican drug cartel, as well as being

"loaded";  and comparing his situation to characters in the  TV series "Breaking

Bad."  There were similar messages, including one about a "plug" (drug source)

who was about to "leave".  Another message, from Mr. Batista to co-defendant

Marrero, said he was 'not feeling it," that he needed to leave and make his own

money, and that he was "busting his ass" for somebody who wouldn't  "take

advice."  (Tr. 111-113, 115, 117-119, 120-121, 124, 126-129, 131-132, 135, 137,

139-40, 145, 148-149, 151-155, 157, 159-160, 162, 167, 170, Gov't Exhs. 18-23)

Also located on the phone were photographs of the containers of liquid

methamphetamine at 3120 Beechwood Drive; a video Mr. Batista testified had

been sent to him and stored on his phone of someone singing (the government

argued it was Defendant, and introduced testimony indicating the video was made

on Mr. Batista's phone) and "cooking" what appeared to be liquid

methamphetamine; as well as a video of Mr. Batista flipping through a large stack

of money.  Defendant testified the money wasn't real.  (Tr. 128, 150, 155, 164-

166, 197, Gov't Exhs. 24-25, 28)

A Mexican phone number to one of the alleged "higher ups" in the

organization was also found on the I-Phone.  (Tr. 160, 193, 221-222)  Mr. Batista

explained he got the number from Marrero and called the man because he wanted

to be paid as promised for driving Marrero to Oklahoma City.  (Tr. 452)  He did

11

this against the advice of Mr. Costa, more about whom later.  (Tr. 160, 281)

At the latest, Mr. Batista left the conspiracy on July 25, when he departed Oklahoma for Texas, and later his home in Florida.   The remaining conspirators, including Malcolm Costa, started a new conversion lab operation in Ardmore, Oklahoma in late July or early August.  They were arrested on August 17 in a sting operation where a controlled buy of six kilos of methamphetamine was arranged, but not consummated.   The residence and outbuildings housing the operation were searched.   Large quantities of crystal and liquid methamphetamine were seized.  It was agreed that Mr. Batista was not involved in this aspect of the conspiracy.  (Tr. 62-64, 67-68, 191-192, 290)

Among the co-defendants, only Malcolm Costa appeared as a government witness.  He knew Defendant in Florida, and they became fairly close friends. They were both aspiring rappers.  (Tr. 258, 263-264)  In early July 2022, Costa was contacted by Mr. Batista and Mario Marrero, and asked to come to Oklahoma. (Tr. 262)  Defendant also discussed this proposal with Costa's father, who thought it was a good idea because his son was on drugs and needed to get away.  (Tr. 262) Costa was told he could get backing for his music in Oklahoma, and that a studio would be provided.  (Tr. 262-263)  Even after everything that happened, Costa testified he believed Defendant was sincere about getting into the music business

12

in Oklahoma. (Tr. 328-329) Mr. Batista testified he wanted Costa to come to Oklahoma to explore possibilities in the music industry, and to get Costa off drugs, not to lure him into a drug ring. (Tr. 434-435)

Costa arrived in Oklahoma City on July 6. He was immediately taken to the Beechwood Drive residence/conversion lab. (Tr. 255-256) According to Costa, Mr. Batista was involved in the operation, cleaning the house, participating in the conversion process, cooking dope, and, according to one of his accounts, making drug deliveries. (Tr. 267-269. 273, 317) Costa said Mr. Batista was the person singing in the video and cooking methamphetamine on the stove. (Tr. 285, Gov't Exh. 28)) Costa also began to participate in manufacturing methamphetamine. (Tr. 268, 273) He claimed to see Marrero pay Mr. Batista $2,000.00 for his work in the lab. (Tr. 270) Costa was promised money, but denied receiving any, although his basic living expenses were covered. (Tr. 270-271)

Costa and co-defendant Rosas were at the Beechwood Drive address when it caught fire on July 16. (Tr. 273) They contacted Marrero and Defendant, who were at a nearby marijuana dispensary. (Tr. 273-274) Mr. Batista went into the house to rescue the dog. (Tr. 314, 443-444) According to Defendant, at Marrero's direction, he also retrieved a backpack of cash. (Tr. 274-275) The prosecution argued Defendant knew it was drug money. Mr. Batista testified he

did not know the contents, and picked it up because Marrero "begged" him to. (Tr. 443-444)

After the fire, the group relocated to a house on N.W. 26th Street in Oklahoma City.  (Tr. 276)  Defendant testified he didn't stay there, but merely cleaned the place  because it was filthy and he was promised payment on his escalating "tab."  (Tr. 431, 433, 445)  No drug manufacturing activities took place at this address.  (Tr. 315)  Defendant was present in the N.W. 26th Street house when it was robbed by people dressed as policemen.  The backpack with the money was taken.  Co-defendant Rosas was beaten up, but Mr. Batista was not. (Tr. 276, 446-447)  The others, including Costa, began to distrust Defendant, thinking he had "set up" the robbery, something Mr. Batista denied, since he had no money.  (Tr. 276-277, 315, 447)   After Defendant left Oklahoma and returned to Florida, there was talk among the others about having him killed.  (Tr. 315-316, 338)  Although the government tried to portray Costa as under Mr. Batista's control, when Defendant left Oklahoma, Costa remained, worked at the Ardmore conversion lab, and was arrested with the others on August 17 in connection with the 6 kilo "buy/bust" operation.  (Tr. 288-290)

Costa was questioned by law enforcement on August 17, after his arrest.  He denied participating in any illegal activities, let alone the manufacture of

14

methamphetamine.  Nor did he implicate Mr. Batista in any illegal activity.  (Tr. 301-302)  There were also contradictions, omissions and "new details" added in his second and third statements to authorities.  (Tr. 303-306, 308-311, 337-338)  Costa was allowed to plead guilty to a "zero to 20" conspiracy, and hoped to receive leniency for his cooperation.  Like Defendant and the others, Costa was originally charged in a "500 grams or more" conspiracy, which carried a much more onerous punishment range.  (Tr. 291-293, 296)  He was later sentenced to time served and a 5 year term of supervised release.  (Docs. 345, 347)  At one point, Costa admitted he was "owned" by the government, due to the plea agreement due to the terms of his plea agreement.  (Tr. 296)

    As noted throughout, Mr. Batista testified in his own defense.  He has a record of convictions for, among other things,  fraud and several burglaries.  (Tr. 420-421)  He decided to come to Oklahoma because Marrero had offered him $5,000.00 and the prospect of getting into the local music business.   He had know intentions getting involved in the drug business, and was unaware this was why Marrero wanted to come to Oklahoma.  (Tr. 422-424)  One of Defendant's girlfriends had died recently, and he wanted to get out of Florida.  (Tr. 423)  When he got here, no meth lab was yet in operation at the Beechwood Drive house, although the lab was operational a couple of days later.  (Tr. 425)

15

Defendant testified he never worked in the lab or joined the conspiracy. He stayed at the Beechwood Drive house for one night on either June 30 or July 1, although he frequented the Beechwood Drive address to hang out with the others and smoke marijuana.[4] (Tr. 436-438) After spending a single night on Beechwood Drive, .and then moved to a nearby motel. Later, he stayed with a girlfriend at an Airbnb. This was confirmed somewhat by Malcolm Costa. (Tr. 327, 430)

Mr. Batista testified he was "stuck" in Oklahoma without money, and with Marrero frequently using his vehicle. He stayed around because he kept expecting to be paid for driving Marrero from Florida. When he realized he was not going to be paid, he decided to leave. Costa testified that Mr. Batista left the conspiracy on July 25 because he was told by Marrero there was no more "work" and he should leave and go back to Florida. (Tr. 4239, 436, 441, 448, 452) Defendant said he was going to leave anyway. He had not been paid despite repeated assurances, the others were not "righteous people," and they had almost let a dog burn to

---

[4] The government introduced a "cell site" analysis conducted by FBI Agent Andrew Karstetter, based on location information gleaned from Mr. Batista's phones. The overwhelming majority of the calls were made "in the vicinity" of the Beechwood Drive address, though this particular location could not be "pinpointed." From this, the government argued Defendant stayed regularly at the Beechwood Drive address. (Tr. 352, 356-357, 359-360, 365, 369-370, 375-376, 378-380, 387, 391-392, 402-403, 405, 407-408)

death.  (Tr. 456)

Additional facts will be discussed as they become relevant.

## SUMMARY OF THE ARGUMENTS

1.  The jury in effect acquitted Mr. Batista of participating in a conspiracy involving 500 or more grams of a mixture or substance containing a detectable amount of methamphetamine, and of being a participant in a conspiracy involving 50 to 500 grams of methamphetamine.  Instead, the jury found, beyond a reasonable doubt, that he was responsible or accountable for less than 50 grams of methamphetamine.

In calculating the advisory guideline range, the district court should have been bound by the jury's verdict on drug quantity .  This is not a situation where a jury simply fails to find certain facts proved beyond a reasonable doubt, but an affirmative finding by the jury which the trial court was not free to ignore.  Also, acquitted conduct should not be considered in determining the sentence.  Failing to follow the jury's verdict on quantity denied Defendant his Sixth Amendment right to a jury trial and his Fifth Amendment due process rights.

2.  Mr. Batista's statements to the DEA and the contents of the cell phones seized from him should have been suppressed because the traffic stop was illegally extended far beyond its purpose, and there was no probable cause to seize the

phones to begin with.

## ARGUMENT

**I. AT A MINIMUM, RESENTENCING IS NECESSARY. THE TRIAL COURT COMMITTED PROCEDURAL ERROR BY IGNORING THE JURY'S AFFIRMATIVE VERDICT ON DRUG QUANTITY AND PLACING THE BASE OFFENSE LEVEL AT FAR HIGHER THAN IT SHOULD HAVE BEEN. THE FAILURE TO ADHERE TO THE JURY'S DETERMINATION OF DRUG QUANTITY VIOLATED DEFENDANT'S SIXTH AMENDMENT RIGHT TO A JURY TRIAL AND HIS FIFTH AMENDMENT DUE PROCESS RIGHTS.**

**A. Standard of Review:** The district court's sentencing decision is

generally reviewed for an abuse of discretion. *Gall v. United States,* 522 U.S. 38,

41 (2007); *United States v. Durham,* 902 F.3d 1180, 1236 (10th Cir. 2018). On

appeal, a sentence is reviewed for reasonableness. "Reasonableness" has both a

procedural and a substantive component. Both the length of the sentence and the

method by which it is calculated are reviewed. *United States v. Martinez-*

*Barragan,* 545 F.3d 984, 898 (10th Cir. 2008). In determining whether a sentence

is procedurally reasonable, the appeals court looks to whether the trial court

"committed any errors in calculating or explaining a sentence." *United States v.*

*Friedman,* 554 F.3d 1361, 1367 (10th Cir. 2009). "Among other things, procedural

error can occur where the advisory guideline range is calculated improperly or a

sentence is based on clearly erroneous facts. " *Gall,* 5223 U.S. at 51.

**B.  Portion of the record where the issue was raised and ruled upon:**

Defendant objected to the Probation Office's attribution of drug quantity to Mr.

Batista, which conflicted with the jury's affirmative verdict in the special

interrogatory.  The base offense level should have been calculated based on less

than 50 grams, rather than "acquitted" totals, which set the base of level at the

highest level available in the drug table.  (ROA Vol.  II pp. 113-118, ROA Vol. I

pp. 448-453)   These arguments were reiterated at sentencing, and were rejected by

the trial court, which adopted the Probation Office's calculation of drug quantity.

(S.Tr. 4-12, 49)

**C.  Discussion**

The Probation Office attributed 693 grams of "Ice" and 132.489 liters of

liquid methamphetamine to Mr. Batista.  (ROA Vol. II pp.  85-86)  These were the

quantities found at the Beechwood Drive residence on July 16, 2022 when the

house caught fire.  The "converted" drug weight was calculated at 267,874.866

kilograms.  (ROA Vol. II pp. 85-86)  Defendant's base offense level was set at 38,

the highest in the drug table.  (ROA Vol. II p. 86)

Mr. Batista objected to the base offense level 38, and to the drug quantity

calculation.  They defied the jury's verdict, which held Defendant accountable,

beyond a reasonable doubt, for less than 50 grams of a mixture or substance of

methamphetamine.  (ROA Vol. II pp. 113-118, ROA Vol. I pp. 448-453)  The jury

rejected finding Defendant accountable for 500 or more grams of

methamphetamine, and likewise rejected a finding that he was responsible for

between 50 and 500 grams.  These amounted to "acquittals" of being responsible

for participating in a conspiracy involving these higher quantities of

methamphetamine.  (ROA Vol. I pp. 281-283)

The advisory guideline range should therefore have been limited to what the

jury found: that Defendant was accountable for less than fifty grams of

methamphetamine.  At the highest, this would place the base offense level at 22

("At least 40 g but less than 50 g of Methamphetamine").  USSG § 2D1.1 (9)(drug

table).  Mr. Batista was found guilty of a conspiracy involving a mixture or

substance of methamphetamine, not "pure" methamphetamine, or "Ice."  (ROA

Vol. I pp. 281-283)

Mr. Batista is in the same position as the defendant in *United States v.*

*Pimental-Lopez,* 828 F.3d 1173, 1176-78 (9th Cir. 2016), *amended, and rehearing*

*en banc denied,* 859 F.3d 1134, 1141-43 (9th Cir. 2017).  In *Pimental-Lopez,* the

defendant was charged with participating in a methamphetamine conspiracy,  as

well as possession of methamphetamine with intent to distribute.  The jury was

given a verdict form like that in Mr. Batista's case, differentiating between

accountability for less than 50 grams of methamphetamine, at least 50 but less than 500 grams of methamphetamine, and 500 grams or more of methamphetamine.

As in Mr. Batista's case, the jury found Pimental-Lopez was accountable for less than fifty grams of methamphetamine. At sentencing, the trial court ignored the jury's verdict and determined the actual quantity attributable to the defendant was 4.536 kilograms, which placed him at a base offense level of 34. Pimental-Lopez was in criminal history category III. This yielded a guideline range of 235 to 293 months. Because the jury found Pimental-Lopez was accountable for less than 50 grams of methamphetamine, the statutory maximum, as it is in Mr. Batista's case, was 20 years, or 240 months. Pimental-Lopez was sentenced to 240 months. Had the judge abided by the jury's finding beyond a reasonable doubt that he was accountable for less than 50 grams of methamphetamine, the sentencing range would have been 63 to 78 months.

The issue on appeal was "whether the district judge was entitled to make a drug quantity finding in excess of that found by the jury in its special verdict." *Pimental-Lopez,* 828 F.3d at 1175, 859 F.3d at 1140. The trial court reasoned it was entitled to ignore the jury's verdict on quantity because a 240 month sentence did not increase the statutory maximum in violation of the rule in *Apprendi v. New*

21

*Jersey,* 530 U.S. 466, 481 (2000). *Apprendi* and later cases touching on the same

principle "leave it up to the district judge to find any facts bearing on sentencing,

other than those that would increase the statutory sentencing range." *Pimental-*

*Lopez,* 828 F.3d at 1175, 859 F.3d at 1140.

The Ninth Circuit panel rejected the reasoning of the district court, vacated

Pimental-Lopez's sentence, and remanded the case for re-sentencing in accord

with the jury's finding that the defendant was accountable for less than 50 grams

of methamphetamine.

> But the *Apprendi* line of cases is beside the point, because defendant
> is not complaining that the district court raised the maximum statutory
> sentence. Rather, he argues that the court's finding that the drug quantity
> found was *more* than 50 grams contradicts the jury's special finding
> that the drug quantity was *less* than 50 grams. The jury found "beyond
> a reasonable doubt [that] the amount of [methamphetamine] attributable
> to Jesus Pimental-Lopez [is] ... [l]ess than 50 grams." This is not a case
> where the jury failed to find a fact under the exacting standard applicable
> to criminal cases. *See, e.g., United States v. Watts,* 519 U.S. 148, 157
> (1997)(per curiam). Where this happens, the district judge is free
> to find the same fact under a less stringent standard of proof. *Id.*
> Rather, what we have here is a case where the jury made an affirmative
> finding, under the highest standard of proof known to our law, that the
> amount of methamphetamine attributable to defendant is less than
> 50 grams. The district court cannot attribute more than that amount
> to defendant without contradicting the jury on a fact it found as a
> result of its deliberations. District judges have many powers, but
> contradicting juries as to findings of facts they have been asked to
> make is not among them. (emphasis in original)

In reaching the contrary conclusion, the district judge overlooked

> our caselaw on point.  In *Mitchell v. Prunty,* 107 F.3d 1337, 1339 n.2
> (9th Cir. 1997), *overruled on other grounds by Santamaria v. Horsley,*
> 133 F.3d 1242, 1248 (9th Cir. 1998)(en banc), we noted as follows:
> "Special findings ... are dispositive of the questions put to the jury.
> Having agreed to the questions, the government cannot now ask us
> to ignore the answers; to do so would be a clear violation of
> petitioner's Sixth Amendment rights."

*Pimental-Lopez,* 828 F.3d at 1176, 859 F.3d at 1140.

The court in *Pimental-Lopez* noted that some of the other courts of appeal,

including the Tenth Circuit in *United States v. Magallanez,* 408 F.3d 672, 685

(10th Cir. 2005), "seem to have held that a jury's special-verdict finding that the

quantity of drugs involved in the crime is less than a particular amount did not

preclude the judge from finding a greater quantity for purposes of sentencing."

*Pimental-Lopez,* 828 F.3d at1176, 859 F.3d at 1141.  The Ninth Circuit noted that

*Magallanez* and similar cases "did not directly address the argument raised by

Pimental-Lopez – that the affirmative finding by the jury that the quantity of drugs

involved was less than a specific amount precluded a contradictory finding by the

district judge during sentencing."  *Pimental-Lopez,* 828 F.3d at 1177, 859 F.3d at

1141.

*Magallanez* and like cases held that the district courts' sentencing decisions

as to drug quantity relied on *Apprendi* and, implicitly, on *United States v. Watts,*

519 U.S. 148, 155, 157 (1997)(per curiam)("a jury's verdict of acquittal does not

prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence" and "[a]n acquittal can only be an acknowledgment that the government failed to prove an essential element of the offense beyond a reasonable doubt"). So long as the statutory maximum was not altered or exceeded, the district court could make its own findings as to drug quantity under a preponderance of the evidence standard. This is what happened in Mr. Batista's case.

But the *Pimental-Lopez* court emphasized this reasoning did not address the issue in that case, and here.

> This rationale is inapplicable where, as here, we have an affirmative finding that the amount in question is less than a particular amount. Or, to put it differently, there is no inconsistency between a jury's acquittal as to a particular fact that had to be proved beyond a reasonable doubt and a later finding that the same fact is proved by a preponderance of the evidence. But there *is* an inconsistency between a jury's finding that the amount is *less* than 50 grams and a later finding by the judge that the amount is *more* than 50 grams. (emphasis in original)
>
> ...
>
> Here ... the record is clear that the jury didn't merely acquit defendant of possessing 50 grams or more of methamphetamine; it made an affirmative finding "beyond a reasonable doubt" that the amount attributable to defendant was "[l]ess than 50 grams." Our own caselaw, and simple logic, precludes us from vouchsafing sentencing judges the power to make contradictory findings under these circumstances.

24

*Pimental-Lopez,* 828 F.3d at 1177, 859 F.3d at 1141-1142.  In the original

opinion, the court concluded:

> Because the district court enhanced defendant's sentence based
> on its finding that more than 50 grams of a controlled substance
> were involved in defendant's crimes, we must vacate the sentence
> and remand with instructions that defendant be resentenced on
> the premise that the quantity of drugs involved in his crimes was
> less than 50 grams, as the jury found.

*Pimental-Lopez,* 828 F.3d at 1178.  Similar language was employed in the

amended opinion.  *Pimental-Lopez,* 859 F.3d at 1143.

 *Pimental-Lopez* held that the Supreme Court's "acquitted conduct"

decision in *United States v. Watts, supra* was not relevant to its analysis.

Nonetheless, it should be noted that the use of acquitted conduct in sentencing is

under steady attack, including by the Sentencing Commission.  Last year, the

Supreme Court decided not to weigh in on the legality of judges increasing prison

sentences based on charges for which defendants were acquitted.  But in a

statement accompanying the denial of certiorari, Justices Sotomayor, Kavanaugh,

Barrett and Gorsuch said declining to review the decision in *McClinton v. United

States,* 600 U.S.___ , No. 21-1557 (June 30, 2023) and related cases "should not

be misinterpreted."  The use of acquitted conduct to alter the range of the advisory

federal sentencing guidelines "raises important questions."

The Seventh Circuit in *McClinton* recognized as much. *United States v. McClinton,* 23 F.4th 732, 735-36 (7th Cir. 2022). There, the defendant argued that because he had been acquitted of a gun charge relating to the homicide of a co-conspirator, he could not be found liable for the homicide at sentencing under the preponderance of evidence standard. McClinton's argument was "not frivolous" and "preserves for Supreme Court review an argument that has garnered increasing support among many circuit court judges and Supreme Court Justices, who in dissenting and concurring opinions have questioned the fairness and constitutionality of allowing courts to factor in acquitted conduct into sentencing calculations." *Id.* McClinton documented a number of opinions in which judges expressed concern in applying *United States v. Watts,* 519 U.S. 148, 155, 157 (1997)(per curiam) to permit acquitted conduct to be considered at sentencing so long as the defendant's conduct is proved by a preponderance of the evidence. Nonetheless, the court in *McClinton* affirmed the trial court's decision to increase the defendant's sentence based on acquitted conduct, believing itself bound by *Watts.*

The district court in Mr. Batista's case also cited *Watts*, and went on to say that even if the court were to apply a "clear and convincing evidence" standard, as suggested by *Watts* where acquitted conduct may be said to "drive" the sentence,

its drug quantity calculation, which mirrored that of the Probation Office, would

be the same.  The district court also found the jury's special verdict, or its answers

to the special interrogatory, conflicted with the evidence, which showed that far,

far more than "less than 50 grams" was involved in the drug conspiracy.  (S.Tr. pp.

4-12)

The government argued, and the district court agreed, that *Pimental-Lopez*

represents a minority view and is not consistent with circuit precedent, citing

*United States v. Keck,* 643 F.3d 789, 798 (10th Cir. 2011)(sentencing factors are to

be decided by a preponderance of the evidence, regardless of any specific jury

findings).  The government also cited the unpublished decision in *United States v.*

*Gunn,* No. 21-6168, 2023 WL 2808108 at *16 (10th Cir. 2023).  *Gunn* involved a

defendant who was attributed with over thirty-nine thousand kilos of converted

drug weight, even though the jury's special verdict held him responsible for 50 to

500 grams.  While persuasive authority, *Gunn,* which dismissed *Pimental-Lopez*

("a Ninth Circuit case") without analysis, is not precedent.  And both *Gunn* and

*Keck* rely reflexively on *Magallanez*, which did not address the argument found

meritorious in *Pimental-Lopez*.  It bears repeating: The situation in Mr. Batista's

case goes not merely to a judge finding sentencing factors by a preponderance of

the evidence where the jury has failed to find them beyond a reasonable doubt, but

an affirmative finding by the jury regarding drug weight accountability or responsibility.

Ignoring the jury's verdict (as the district court did here), which affirmatively held Defendant accountable for less than 50 grams of methamphetamine, violated his Sixth Amendment jury trial rights and his rights to due process under the Fifth Amendment.  The court should have been bound by the jury's verdict as to quantity, because it was an affirmative finding, not just a "failure to find" certain facts beyond a reasonable.  *Pimental-Lopez*, *supra.* Relatedly (but distinctly), it should finally be ruled that what amounts to acquitted conduct can play no part in the sentencing decision.   Accordingly, Mr. Batista's case should be remanded for resentencing if his conviction is not reversed.

**II.  DEFENDANT'S CONVICTION SHOULD BE REVERSED BECAUSE THE TRAFFIC STOP WAS EXTENDED ILLEGALLY TO OBTAIN STATEMENTS AND TO SEIZE HIS CELL PHONES.  IN ADDITION, THERE WAS NO PROBABLE CAUSE TO LATER AUTHORIZE SEARCH OF THE CONTENTS OF THE PHONES.**

**A.  Standard of review:** When reviewing a district court's denial of a motion to suppress, this Court reviews findings of fact for clear error.  The evidence is viewed in the light most favorable to the government.  Whether a search or seizure was reasonable under the Fourth Amendment is a legal question that is reviewed *de novo*.  *United States v. Venezia,* 995 F.3d 1170, 1175 (10th Cir.

2021).

**B.  Portion of the record where the issue was raised and ruled upon.**

Defendant filed a motion to suppress.  (ROA Vol. I pp. 33-53) The government

filed a response.  (ROA Vol. I pp. 67-92)  Appended to the response were a

number of exhibits, including the applications and warrants authorizing the search

of the phones.  (ROA Vol. I pp. 67-162)  A hearing was conducted.  (M.Tr., partial

transcript).  The district court issued an order denying the motion to suppress.  At

trial, Defendant made contemporaneous objections to the introduction of his

statements to the DEA and the contents of the cell phones, including text

messages, videos, and photographs.  (Tr. 62-63, 65-66, 103, 108, 111, 114, 117-

121, 137, 150, 155, 157, 159, 164, 167-168)

**C.  Discussion**

As recounted in the Statement of Facts, Trooper Shores, at the direction of

the DEA, conducted a traffic stop on Defendant.  The reason for the stop was

because Mr. Batista was using the left passing lane as a "through lane."

Notwithstanding the fact that Defendant had no driver's license, possessed

identification in other people's names, and possessed a small quantity of

marijuana, Defendant was not arrested, but was simply given a warning.  His car

was not impounded.  The stop for a minor traffic violation, with no action beyond

a warning to be taken, was illegally extended in violation of the Fourth

Amendment to permit extensive questioning by the DEA of Mr. Batista regarding

an unrelated drug investigation, and to allow the agents to seize Defendant's cell

phones without a warrant. The warrants issued by a state judge and, later, a

federal magistrate, permitting searches of the contents of the phones, flowed from

the initial illegality in improperly extending the stop. Moreover, there was simply

no probable cause to seize the cell phones in the first instance, and no probable

cause beyond speculation for the warrants to issue.

A traffic stop is a seizure under the Fourth Amendment. *Delaware v.*

*Prouse,* 440 U.S. 648, 653 (1979); *United States v. Hunnicut,* 135 F.3d 1345, 1348

(10th Cir. 1998). The reasonableness of a traffic stop is judged under the test of

*Terry v. Ohio,* 392 U.S. 1, 20 (1968), even though most traffic stops for observed

violations rest on probable cause rather than reasonable suspicion. *United States*

*v. Botero-Ospina,* 71 F.3d 783, 788 (10th Cir. 1995)(en banc). Fourth Amendment

reasonableness under *Terry* depends on whether the officer's action in making the

stop is justified at its inception, and whether the stop is reasonably related in scope

and duration to the circumstances which justified it in the first place. Absent

reasonable suspicion or probable cause, the scope and duration of a traffic stop is

limited. It must extend no further and last no longer than is necessary to effectuate

its purpose.  *Rodriguez v. United States,* 575 U.S.___, 135 S.Ct. 1609 (2015);

*Florida v. Royer,* 461 U.S. 491, 500 (1984).  *See also United States v. Holt,* 264

F.3d 1215, 1220 (10th Cir. 2001)(en banc)[5]; *United States v. Caro,* 248 F.3d 1240,

1244 (10th Cir. 2001)  Put another way, a police traffic stop exceeding the time

needed to handle the reason it was initiated violates the Fourth Amendment's

prohibition against unreasonable seizures.  *Rodriguez, supra.*  "Authority for the

seizure ends when tasks tied to the traffic infraction are – or reasonably should

have been completed." *Rodriguez,* 135 S.Ct. At 1614.

During a traffic stop, an officer may ask the driver about his or her authority

to operate a vehicle, determine whether the driver has a driver's license and

registration, and issue a warning or ticket for a traffic violation.  *United States v.*

*Caro, supra.*  A motorist reasonably expects to continue on his or her way once

the purpose of the stop – in this case, using the left lane for travel rather than to

pass another motorist – is met.  *Berkemer v. McCarty,* 468 U.S. 420, 437 (1984).

The government's general interest in criminal investigation, without more,

is insufficient to outweigh the individual's interest in ending the detention.  Once

---

[5] In *Holt*, 264 F.3d at 1228-29, the Court rejected the government's argument that so long as the duration of the stop does not exceed what is reasonably necessary to accomplish its purpose, law enforcement may expand the scope of the stop by inquiring into matters which are not relevant to its original justification.

someone stopped for a traffic violation produces a valid license and proof that he

or she is authorized to operate the vehicle, they must be allowed to leave without

being subjected to additional police questioning.  *United States v. Guzman,* 864

F.2d 1512, 1519 (10th Cir. 1988), *overruled on other grounds, United States v.*

*Botero-Ospina, supra.*

A traffic stop may be extended beyond its original purpose in both scope

and duration for one of two reasons (or both): where reasonable suspicion or

probable cause develops that the motorist committed or was committing another

crime, or where, after the traffic stop is completed, the police -citizen encounter

becomes "consensual."  *United States v. Villa-Chapparo,* 115 F.3d 797, 801 (10th

Cir. 1997); *United States v. Elliott,* 107 F.3d 810, 813 (10th Cir. 1997).  The return

of the motorists documents, such as a driver's license, is a necessary precondition

to a consensual encounter.  *Caro,* 248 F.3d at 1243, *Elliott,* 107 F.3d at 813-814.

Even where a motorist's documents have been returned, an encounter becomes

consensual only where a reasonable person, under the circumstances, believes he

or she is free to leave and can disregard the officer's request for additional

information.  *Id.  See also, United States v. Sandoval,* 29 F.3d 537, 542 (10th Cir.

1994).

Questioning on matters unrelated to the stop, or which lengthen the

detention beyond what is necessary to accomplish its purpose, can violate the

Fourth Amendment, render the stop unreasonable, and lead to the suppression of

evidence. *Holt,* 264 F.3d at 1228-30. Evidence discovered as the result of an

unlawful detention will be suppressed if: 1) the defendant establishes his detention

violated his or her Fourth Amendment rights, and 2) a factual nexus exists

between the illegality and the discovery of the evidence. To establish the required

factual nexus, the defendant must demonstrate the contested evidence would not

have been discovered but for law enforcement's unconstitutional actions. Was the

illegality exploited to secure the evidence? *United States v. Chavira,* 467 F.3d

1286, 1291 (10th Cir. 2006).

    If these showings are made, the government must establish the evidence is

not the fruit of the poisonous tree because it would have been discovered

inevitably; that it would have been discovered through an independent source; or

that its discovery was so attenuated from the illegal conduct that any taint is

rendered insignificant. *United States v. Nava-Ramirez,* 210 F.3d 1128, 1131 (10th

Cir. 2000).

    To ascertain whether intervening circumstances overcome the taint of

official misconduct, courts look to the proximity in time between the illegal

seizure and discovery of the evidence, any intervening circumstances, and the

purpose and flagrancy of the police misconduct.  The purpose and flagrancy of

official misconduct may be shown by evidence that the actions of the police were

purposely investigative in character; that the detention or arrest was obviously

illegal and that, for example, the arresting or detaining officer was aware the arrest

or detention was illegal.  *Brown v. Illinois,* 422 U.S. 590, 605 (1975); *Wong Sun v.*

*United States*, 371 U.S. 471, 487 (1963).

Even granting there was reasonable suspicion or probable cause to stop

Defendant for using the left passing lane improperly, its purely investigatory and

drawn-out nature led the detention to far exceed what was necessary to write a

warning for improper lane usage.  Because the unjustified extension of the stop

was exploited to obtain statements from Mr. Batista and seize his cell phones, the

acquisition of the evidence was the fruit of the poisonous tree.

There was no probable cause or reasonable suspicion to detain Mr. Batista

beyond what Trooper Shores quickly determined – that Defendant was driving

without a license, had a small quantity of marijuana in his car, and had

identification documents in other names.  Notwithstanding these facts, Trooper

Shores let Mr. Batista off with a warning.  He was not detained for anything else.

There was no probable cause to arrest Defendant or detain him as being part of the

drug ring under investigation.  Based on Mr. Batista's statements to the DEA, he

was a witness, not a participant.  Defendant was ultimately released, but only after being turned over to the DEA for questioning.  This marathon roadside encounter far exceeded, in duration and scope, the purpose of writing a warning for a minor lane violation.  Mr. Batista would not have been free to leave had he failed to give consent to search his vehicle and be questioned by DEA agents.  He was in fact not free to leave until the entire roadside investigatory process played out, at length.

Nor did questioning by the DEA and the seizure of Mr. Batista's two cell phones amount to a "consensual" encounter.  The questioning by the DEA agents and the seizure of Defendant's cell phones were completely unrelated to the purpose of the traffic stop.  Defendant's documents (such as they were) had not been returned and he was apparently not told he was free to leave until the DEA agents had completed their questioning.  Again, he was not arrested for any other offense uncovered during the stop.  There is a clear temporal and factual nexus between the Fourth Amendment violation (improper extension of the stop) and the acquisition of Defendant's statements and the seizure of his cell phones.

In addition, any evidence derived from the search of the cell phones, which was recounted in the Statement of Facts, should be suppressed because they were initially seized illegally without a warrant, not to mention probable cause.  No

35

exception to the warrant requirement existed.  The illegal seizure of the cell phones tainted the state search warrant and the later federal warrant permitting a search of the contents of the phone.  No probable cause justified issuance of the state search warrant and the later federal search warrant.  The affidavits in support of these warrants simply state, in essence, that because Mr. Batista was suspected of being part of a drug ring, and had cellular telephones, there must of necessity be relevant evidence on the phones.  This amounts to no more than speculation by tautological reasoning.  The absence of probable cause to seize and search the cell phones vitiates any reliance on the good faith exception.  *United States v. Leon,* 468 U.S. 897 (1984).

Accordingly, Mr. Batista's conviction should be reversed due to the illegal acquisition of his statements and cell phones.

## CONCLUSION

Based on the foregoing argument and authority, Mr. Batista's conviction should be reversed.  In the alternative, the case should be remanded for resentencing.

## STATEMENT REGARDING ORAL ARGUMENT

Mr. Batista requests oral argument.  There are important issues regarding the sentencing proceedings and the Fourth Amendment.

Respectfully submitted,

/s/ David Autry
David Autry, OBA #11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
(405) 521-9600
(405) 521-9669 [fax]
dbautry77@gmail.com

Lawyer for Defendant/Appellant,
Adonis Batista

## CERTIFICATE OF MAILING AND ELECTRONIC SERVICE

This is to certify taht on this 5th day of June 2024, a true and correct copy of the foregoing instrument was served electronically via CM/ECF to Travis Leverett and Thomas B. Snyder, AUSAs, at their respective email addresses.

/s/ David Autry

## CERTIFICATE OF DIGITAL SUMBISSIONS

I hereby certify that with respect to the foregoing brief:

1. All privacy redactions have been made;

2. If required to file additional hard copies, that the ECF submission is an exact copy of those documents;

3. The ECF submission was scanned for viruses with the most recent version of a commercial virus-scanning program, and is free of viruses.

/s/ David Autry

## **CERTIFICATE OF COMPLIANCE**

As required by Fed.R.App. 32(a)(7)( C), I certify that this brief is proportionally spaced and contains 8550 words.  I relied on my word processor to obtain the count, and it is WordPerfect 8.  I certify that this information is true and correct to the best of my knowledge and belief formed after a reasonable inquiry.

.

/s/ David Autry

Case 5:22-cr-00374-PRW Document 84-1 Filed 12/04/23 Page 10 of 19
Appellate Case: 23-6220 Document: 010110966163 Date Filed: 06/05/2024 Page: 11
AO 245B (Rev. 09/19) Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT

### Western District of Oklahoma

| | |
|---|---|
| UNITED STATES OF AMERICA<br>**v.**<br><br>ADONIS BATISTA,<br>a/k/a<br>A-1 | ) **JUDGMENT IN A CRIMINAL CASE**<br>)<br>)<br>) Case Number:    CR-22-00374-001-PRW<br>)<br>) USM Number:    24367-510<br>)<br>) David B. Autry<br>) Defendant's Attorney |

## THE DEFENDANT:

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
which was accepted by the court.

☒ was found guilty on count(s)    1 of the Indictment.
after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 21 U.S.C. § 846,<br>21 U.S.C. § 841(b)(1)(C) | Drug Conspiracy | 08/18/2022 | 1 |
| | Criminal Forfeiture | | |

The defendant is sentenced as provided in pages 2 through ___7___ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☐ Count(s) _____ ☐ is ☐ are dismissed on the motion of the United States.

     It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

November 30, 2023
Date of Imposition of Judgment

PATRICK R. WYRICK
UNITED STATES DISTRICT JUDGE

12/4/2023
Date Signed

AO 245B (Rev. 09/19)  Judgment in Criminal Case
Sheet 2 — Imprisonment

Judgment — Page  2  of  7

DEFENDANT:          Adonis Batista, a/k/a A-1
CASE NUMBER:        CR-22-00374-001-PRW

# IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:
**240 months.**

☒      The court makes the following recommendations to the Bureau of Prisons:

It is recommended the defendant participate in the Federal Bureau of Prisons Inmate Financial Responsibility Program at a rate
determined by Bureau of Prisons staff in accordance with the program;

If eligible, it is recommended that the defendant participate in the Residential Drug Abuse Program while incarcerated; and

If eligible, it is recommended that the defendant be designated to FCI Marianna or USP Coleman I and II.

☒      The defendant is remanded to the custody of the United States Marshal.

☐      The defendant shall surrender to the United States Marshal for this district:

☐  at _____  ☐ a.m.   ☐ p.m.   on  _____ .

☐  as notified by the United States Marshal.

☐      The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

☐  By 2 p.m. on  _____

☐  as notified by the United States Marshal.

☐  as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

Defendant delivered on _____  to  _____

at _____ ,  with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By  _____

DEPUTY UNITED STATES MARSHAL

AO 245B (Rev. 09/19) Judgment in a Criminal Case
      Sheet 3 — Supervised Release

|  |  | Judgment—Page 3 of 7 |
|---|---|---|

DEFENDANT:     Adonis Batista, a/k/a A-1
CASE NUMBER:   CR-22-00374-001-PRW

# SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of:
 **3 years.**

## MANDATORY CONDITIONS

1.   You must not commit another federal, state or local crime.
2.   You must not unlawfully possess a controlled substance.
3.   You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, not to exceed eight (8) drug tests per month.
       ☐ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4.   ☐ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. (check if applicable)
5.   ☒ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6.   ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7.   ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

AO 245B (Rev. 09/19) Judgment in a Criminal Case
Sheet 3A — Supervised Release

| | Judgment— | 4 | of | 7 |

DEFENDANT: Adonis Batista, a/k/a A-1
CASE NUMBER: CR-22-00374-001-PRW

## STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1. You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2. After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3. You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4. You must answer truthfully the questions asked by your probation officer.
5. You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6. You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7. You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8. You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9. If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. Stricken.
13. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's
Signature

Date

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
          Sheet 3B— Supervised Release

Judgment—Page   5   of   7  

DEFENDANT:     Adonis Batista, a/k/a A-1
CASE NUMBER:   CR-22-00374-001-PRW

# SPECIAL CONDITIONS OF SUPERVISION

1.     The defendant must submit to a search of his person, property, electronic devices, or any automobile under his control to be conducted in a reasonable manner and at a reasonable time, for the purpose of determining possession, or evidence of possession, of firearms, stolen property, counterfeited identification or currency, controlled substances and/or drug trafficking activities at the direction of the probation officer upon reasonable suspicion. Further, the defendant must inform any residents that the premises may be subject to a search.

2.     The defendant shall participate in a program of substance abuse aftercare at the direction of the probation officer to include urine, breath, or sweat patch testing, and outpatient treatment. The defendant shall totally abstain from the use of alcohol and other intoxicants both during and after completion of any treatment program. The defendant shall not frequent bars, clubs, or other establishments where alcohol is the main business. The court may order that the defendant contribute to the cost of services rendered (copayment) in an amount to be determined by the probation officer based on the defendant's ability to pay.

3.     The defendant shall participate in a program of mental health aftercare at the direction of the probation officer. The court may order that the defendant contribute to the cost of services rendered (copayment) in an amount to be determined by the probation officer based on the defendant's ability to pay.

4.     The defendant shall participate in an approved domestic violence program at the direction of the probation officer.

AO 245B (Rev. 09/19) Judgment in a Criminal Case
      Sheet 5 — Criminal Monetary Penalties

| | Judgment — Page | 6 | of | 7 |

DEFENDANT:       Adonis Batista, a/k/a A-1
CASE NUMBER:    CR-22-00374-001-PRW

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | **Assessment** | **Restitution** | **Fine** | **AVAA Assessment*** | **JVTA Assessment**** |
|---|---|---|---|---|---|
| **TOTALS** | $ 100.00 | $ 0.00 | $ 0.00 | 0.00 | 0.00 |

☐   The determination of restitution is deferred until _____. An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐   The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

     If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss*** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|

| **TOTALS** | $ _____ | $ _____ | |

☐ Restitution amount ordered pursuant to plea agreement   $ _____

☐   The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐   The court determined that the defendant does not have the ability to pay interest and it is ordered that:

     ☐ the interest requirement is waived for the   ☐ fine   ☐ restitution.

     ☐ the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

\* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
\*\* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
\*\*\*   Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B (Rev. 09/19) Judgment in a Criminal Case
    Sheet 6 — Schedule of Payments

---

|  |  | Judgment — Page <u>7</u> of <u>7</u> |

DEFENDANT: Adonis Batista, a/k/a A-1
CASE NUMBER: CR-22-00374-001-PRW

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A   ☒   Lump sum payment of $ <u>100.00</u>     due immediately, balance due

     ☐   not later than _____ , or

     ☐   in accordance with   ☐   C,   ☐   D,   ☐   E, or   ☐   F below; or

B   ☐   Payment to begin immediately (may be combined with   ☐ C,   ☐ D, or   ☐ F below); or

C   ☐   Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after the date of this judgment; or

D   ☐   Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after release from imprisonment to a term of supervision; or

E   ☐   Payment during the term of supervised release will commence within _____ *(e.g., 30 or 60 days)* after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F   ☐   Special instructions regarding the payment of criminal monetary penalties:

     If restitution is not paid immediately, the defendant shall make payments of 10% of the defendant's quarterly earnings during the term of imprisonment.

     After release from confinement, if restitution is not paid immediately, the defendant shall make payments of the greater of $_____ per month or 10% of defendant's gross monthly income, as directed by the probation officer. Payments are to commence not later than 30 days after release from confinement.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, shall be paid through the United States Court Clerk for the Western District of Oklahoma, 200 N.W. 4th Street, Room 1210, Oklahoma City, Oklahoma 73102.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐   Joint and Several

| Case Number<br>Defendant and Co-Defendant Names<br>*(including defendant number)* | Total Amount | Joint and Several<br>Amount | Corresponding Payee,<br>if appropriate |
|---|---|---|---|

☐   The defendant shall pay the cost of prosecution.
☐   The defendant shall pay the following court cost(s):
☒   The defendant shall forfeit the defendant's interest in the following property to the United States:

     All right, title, and interest in the assets listed in the Preliminary Order of Forfeiture dated <u>March 6, 2023 </u>(doc. no. <u>244</u>).

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA, )
         )
   Plaintiff,    )
         )
v.           )   Case No. CR 22-374-PRW-1
         )
ADONIS BATISTA,    )
         )
   Defendant.   )

## NOTICE OF APPEAL

Notice is hereby given that Adonis Batista, Defendant in the above-named case,

hereby appeals to the United States Court of Appeals for the Tenth Circuit from the final

judgment entered in this action on December 4, 2023.  (Docs. 336-338)

       Respectfully submitted,

       /s/ David Autry
       David Autry, OBA #11600
       1021 N.W. 16th Street
       Oklahoma City, OK 73106
       (405) 521-9600
       (405) 521-9669 [fax]
       dbautry77@gmail.com

       Lawyer for Defendant,
       Adonis Batista

1

**Certificate of Electronic Filing and Service**

This is to certify that on this 10th day of December 2023, I caused the foregoing instrument to be filed with the Clerk of the Court using the ECF System for filing, with electronic service to be made via CM/ECF to Travis Leverett and Thomas B. Snyder, AUSAs, and to all counsel of record. To counsel's knowledge, there are no non-ECF registrants who are counsel in this case.

/s/ David Autry