No. 23-6204

# In the United States Court of Appeals for the Tenth Circuit

UNITED STATES OF AMERICA, PLAINTIFF-APPELLEE,

V.

ADONIS BATISTA, DEFENDANT-APPELLANT.

ON APPEAL FROM
THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

THE HONORABLE PATRICK R. WYRICK
DISTRICT JUDGE

D.C. NO. CR-22-374-PRW

BRIEF OF PLAINTIFF-APPELLEE
ORAL ARGUMENT NOT REQUESTED

ROBERT J. TROESTER
United States Attorney

TRAVIS LEVERETT
Assistant United States Attorney
210 Park Avenue, Suite 400
Oklahoma City, OK 73102
Telephone (405) 553-8700
Attorney for Plaintiff-Appellee

# **Table of Contents**

**Page(s)**

Table of Authorities..........................................................................iv

Prior or Related Appeals .......................................................viii

Jurisdictional Statement...............................................................1

Statement of the Issues.................................................................1

Statement of the Case ...................................................................2

    I.    Background .........................................................................2

        July 16, 2022 House Fire Investigation................................2

    II.    Procedural History ................................................................9

        Pre-trial Proceedings.............................................................9

        Sentencing ...........................................................................11

Summary of the Argument ......................................................12

Argument......................................................................................13

    I.    The district court correctly rejected Mr. Batista's
        suppression motions...........................................................13

        A.    Standard of Review......................................................13

        B.    The Duration of the Traffic Stop. ................................14

        C.    The Seizure of Mr. Batista's Cell Phones. ..................16

        D.    The Search Warrants for Cell Phone Data.................18

            1.    Mr. Batista's inadequate briefing of his claim
                regarding the sufficiency of the search warrant
                affidavits waives those arguments. ....................19

ii

2.    Even if Mr. Batista's arguments are not waived, both warrants are supported by probable cause.................................................20

3.    Even if one of the warrants lacks probable cause, DEA agents relied on those warrants in good faith. .......................................22

II.    The district court did not abuse its discretion in sentencing Mr. Batista.................................................23

A.    The ultimate standard of review is abuse of discretion. ...................................................23

B.    This district court correctly attributed more than 50 grams of methamphetamine to Mr. Batista. ..........23

Conclusion ................................................................27

Certificate of Compliance with Type-Volume Limitation, Typeface Requirements, and Type Style Requirements.......................................28

## Table of Authorities

Page(s)

### Federal Cases

*Alleyne v. United States*,
570 U.S. 99 (2013)..................................................................26

*Andersen v. DelCore*,
79 F.4th 1153 (10th Cir. 2023) ...........................................16

*Horton v. California*,
496 U.S. 128 (1990)..............................................................18

*Koon v. United States*,
518 U.S. 81 (1996)................................................................23

*In re Smith*,
10 F.3d 723 (10th Cir. 1993)..........................................24-25

*Massachusetts v. Upton*,
466 U.S. 727 (1984)..............................................................21

*Murrell v. Shalala*,
43 F.3d 1388 (10th Cir. 1994)..............................................19

*New York v. P.J. Video, Inc.*,
475 U.S. 868 (1986)..............................................................21

*United States v. Babilonia*,
854 F.3d 163 (2nd Cir. 2017) ..............................................18

*United States v. Biglow*,
562 F.3d 1272 (10th Cir. 2009)............................................21

*United States v. Booker*,
543 U.S. 220 (2005)..............................................................26

*United States v. Carbajal-Iriarte*,
586 F.3d 795 (10th Cir. 2009)..............................................16

*United States v. Cassius*
  777 F.3d  1093 (10th Cir. 2015)...........................................................26

*United States v. Cardall,*
  773 F.2d 1128 (10th Cir. 1985)...........................................................22

*United States v. Chambers,*
  882 F.3d 1305 (10th Cir. 2018)...........................................................22

*United States v. Danhauer,*
  229 F.3d 1002 (10th Cir. 2000)...........................................................20

*United States v. Edwards,*
  813 F.3d 953 (10th Cir. 2015)......................................................20, 22

*United States v. Finnesy,*
  953 F.3d 675 (10th Cir. 2020)..............................................................23

*United States v.Gates,*
  462 U.S. 213 (1983)...........................................................................15

*United States v. Gunn,*
  No. 21-6168, 2023 WL 2808109 (10th Cir. Apr. 6, 2023).............24, 26

*United States v. Henderson,*
  595 F.3d 1198 (10th Cir. 2010).....................................................22, 23

*United States v. Keck,*
  643 F.3d 789 (10th Cir. 2011)..............................................................24

*United States v. Latorre,*
  893 F.3d (10th Cir. 2018)....................................................................15

*United States v. Leon,*
  468 U.S. 897 (1984)............................................................................19

*United States v. Loucks,*
  806 F.2d 208 (10th Cir. 1986)..............................................................15

*United States v. Magallanez,*
  408 F.3d 672 (10th Cir. 2005)........................................................24, 25

*United States v. Mayville,*
   955 F.3d 825 (10th Cir. 2020) ........................................................... 14

*United States v. McNeal,*
   862 F.3d 1057 (10th Cir. 2017) ......................................................... 14

*United States v. Parada,*
   577 F.3d 1275 (10th Cir. 2009) ......................................................... 16

*United States v. Pickel,*
   863 F.3d 1240 (10th Cir. 2017) ......................................................... 14

*United States v. Pimentel-Lopez,*
   859 F.3d 1134 (9th Cir. 2016) ...................................................... 24, 25

*United States v. Place,*
   462 U.S. 699 (1983) ...................................................................... 16, 17

*United States v. Slater,*
   971 F.2d 626 (10th Cir. 1992) ........................................................... 18

*United States v. Snyder,*
   793 F.3d 1241 (10th Cir. 2015) ......................................................... 15

*United States v. Sokolow,*
   490 U.S. 1 (1989) ............................................................................... 15

*United States v. White,*
   782 F.3d 1118 (10th Cir. 2015) ......................................................... 23

*United States v. Wooten,*
   377 F.3d 1134 (10th Cir. 2004) ......................................................... 19

## **Federal Statutes**

18 U.S.C. § 3231 ...................................................................................... 1

18 U.S.C. § 3742(a) ................................................................................. 1

21 U.S.C. § 841(a)(1) ............................................................................... 1

21 U.S.C. § 841(b)(1)(C) ....................................................................... 11

21 U.S.C. § 846 ........................................................................................1

28 U.S.C. § 1291 ......................................................................................1

## **Federal Rules**

10th Cir. R. 28.1(A)(2) ...........................................................................1

## **Prior or Related Appeals**

There are no prior or related appeals.

## Jurisdictional Statement

On September 6, 2022, a federal grand jury in the Western District of Oklahoma returned an Indictment charging Adonis Batista and five codefendants with engaging in a drug conspiracy involving more than 500 grams of methamphetamine, in violation of 21 U.S.C. § 841(a)(1). ROA, Vol. 1, at 12–14.[1] Mr. Batista was convicted by a jury of engaging in the charged conspiracy. *Id.* at 281–83. In a final order entered on December 4, 2023, the district court sentenced him to 240 months' imprisonment. *Id.* at 464. The district court had jurisdiction pursuant to 18 U.S.C. § 3231.

Mr. Batista filed a timely notice of appeal on December 10, 2023. *Id.* at 470. This Court has jurisdiction pursuant to 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291.

## Statement of the Issues

Mr. Batista was convicted at jury trial of engaging in a drug conspiracy, in violation of 21 U.S.C. § 846.  On appeal, he raises two issues:

---

[1]    Citations are to documents included in the record on appeal, identifying the volume and page number where they are located, e.g., "ROA, Vol. ___, at ___." *See* 10th Cir. R. 28.1(A)(2).

1

1.  Did the district court correctly deny a pretrial motion to suppress evidence based on a claim that a traffic stop was unlawfully extended and a related claim that agents unlawfully seized and searched cell phones?

2.  Because the jury found that the United States only proved beyond a reasonable doubt that Mr. Batista was accountable for less than 50 grams of methamphetamine, did the district court abuse its discretion when it found by a preponderance of the evidence that Mr. Batista was accountable for 127 kilograms of methamphetamine for purposes of sentencing?

## Statement of the Case

## I.     Background

### *July 16, 2022 House Fire Investigation*

On July 16, 2022, the Oklahoma City Drug Enforcement Administration (DEA) received a call from Del City, Oklahoma fire officials regarding a house fire at 3120 Beechwood Drive in Del City. *See* ROA, Vol. 1, at 91–94. The house partially burned that day, and officials suspected it was drug related. *Id*. After securing a search warrant, DEA agents searched the house and found items suggesting

that drug traffickers used the house as a lab to convert liquid methamphetamine to crystal. *Id.* In total, agents recovered approximately 300 pounds of both liquid and crystal methamphetamine from the house. *See* ROA, Vol. 3, at 50–52. Agents also found identification cards, bank cards, and a phone bill inside the house bearing Mr. Batista's name. ROA, Vol. 1, at 101.

In the days following the fire, agents worked to establish the identities of the individuals and organization responsible for the conversion lab. *Id.* Items from the lab led agents to identify codefendants Malcom Costa, Brayan Aguilar-Aguilar, and Mario Marrero as men who were likely present in the lab with Mr. Batista. *See id.* at 108–09. Based on a Wal-Mart receipt found in the house, DEA obtained store surveillance tape showing Messrs. Batista, Costa, and Marrero shopping together at Wal-Mart at the time of the purchase. *Id.* Soon after identifying Mr. Batista, agents learned that his criminal record included multiple felony convictions along with arrests and convictions for drug crimes related to morphine, oxycodone, and marijuana. *Id.* at 119–40.

<u>*July 25, 2022 Traffic Stop*</u>

Nine days after the fire, on July 25, agents located Mr. Batista at the same Wal-Mart they knew him to frequent. *Id*. at 101. Agents then began conducting surveillance on Mr. Batista. *Id*. Agents watched him drive by himself to a PetSmart parking lot in Norman, Oklahoma. *Id*. There, he met with individuals in a Dodge Ram. *Id*. Mr. Batista sat in the back passenger seat of the Ram for 20 minutes. *Id*. He then removed a trash bag from the bed of the Ram and placed it in his SUV. *Id*. at 101–02. Likewise, he removed an unknown item from his SUV and placed it in the Ram. *Id*. at 102. Both vehicles then departed, driving in opposite directions. *Id*.

Agents maintained surveillance on Mr. Batista's SUV as it drove south on I-35 from Norman. *Id*. at 102, 376. Near Ardmore, Oklahoma, DEA Special Agent (SA) Jeremy Epp asked Oklahoma Highway Patrol (OHP) Trooper Shores to conduct a traffic stop of Mr. Batista's SUV. Supp. ROA, Vol 1, at 28. Trooper Shores initiated a traffic stop at 9:55 p.m. after using his radar detector to observe Mr. Batista's SUV exceed the speed limit. *Id*. at 21; *see also* ROA, Vol. 1, at 155. Once Trooper Shores made contact with Mr. Batista, he immediately noticed the

strong odor of marijuana coming from the car and learned that Mr.

Batista was driving without a license. Supp. ROA, Vol. 1, at 32.

Trooper Shores asked Mr. Batista to speak with him inside his

OHP vehicle while he ran law enforcement checks. ROA, Vol. 4, at 1:50–

2:40. Less than eight minutes into the traffic stop, Trooper Shores

asked for Mr. Batista's consent to search the SUV and Mr. Batista said,

"Oh yeah, go ahead." *Id*. at 7:38–7:48. Trooper Shores confirmed the

consent a second time, and Mr. Batista again provided consent. *Id*. at

8:30–8:32. During the search, officers found small amounts of

marijuana and multiple identification cards with Mr. Batista's

photograph but different names. ROA, Vol. 1, at 155.

<u>Mr. Batista's Post-Miranda Interview</u>

Toward the end of the search of the SUV, DEA SAs Epp and Sean

Lively asked Mr. Batista to speak with them at 10:58 p.m. ROA, Vol. 1,

at 155. SA Lively read Mr. Batista his *Miranda* rights from a DEA-13

card. *Id*. Mr. Batista confirmed that he understood those rights and

agreed to speak with the agents in a DEA vehicle. *Id*. at 155–56. The

interview began at 10:58 p.m. and lasted less than two hours. *Id*. at

155–59.

During the interview, many of Mr. Batista's statements were internally inconsistent, illogical, or contradicted information known to agents. For instance, Mr. Batista told agents that he moved from Florida to Oklahoma within the past month "for a new opportunity" offered by one of his friends and to pursue a rap career. *Id*. at 156. He said that he was paid $3,000 to drive a person he met in jail and knew as "Sicario"[2] from Florida to Oklahoma. *Id*. He said that he stayed one night at the Del City house on July 6 but left the next day because he saw things there that made him uncomfortable and alluded to drug activity, noting "a weird smell" and "numerous Santa Muerte candles." *Id*. He said that he did not know why his belongings were found at the house and that "there's no reason for my stuff to be there." *Id*.

During the interview, Mr. Batista used his cell phones to provide information to agents including phone numbers and addresses associated with different coconspirators, including codefendant Marrero. Supp. ROA, Vol. 1, at 80. Mr. Batista also provided Instagram accounts associated with those coconspirators. *Id*. at 73. Mr. Batista

---

[2]     Sicario—translated to English as "hitman"—is an alias for Mr. Batista's codefendant, Mario Marrero. *See* ROA, Vol. 1, at 12.

further told agents that he placed an anonymous call to the Oklahoma Bureau of Narcotics the day before the traffic stop to report about the high-level drug trafficking activities of Marrero. *See id.* at 75; *see also* ROA, Vol. 1, at 161–62. In that call, Mr. Batista provided Marrero's phone number along with a phone number for a person Mr. Batista claimed supplied Marrero with methamphetamine. *See* ROA, Vol. 1 at 161–62.

Despite Mr. Batista's apparent knowledge that Marrero was a high-level drug trafficker, Mr. Batista admitted that he spent significant time with Marrero, including spending multiple days at a residence that Marrero allowed him to access, spending time with Marrero at locations in Norman, Del City, Oklahoma City, and Ardmore, shopping with Marrero at Wal-Mart, and meeting with Marrero that evening to exchange clothes. *See id.* at 157–58. In an odd twist, Mr. Batista also claimed that he and a male he knew only as Marrero's boss[3] were recently tied up, held at gunpoint by masked

---

[3]    Due to the circumstances of the apparent robbery and the lack of evidence that Marrero maintained legitimate employment in Oklahoma, SA Epp testified that he believed Mr. Batista's was referring to "the

intruders, and robbed at a residence in Oklahoma City. *Id*.

*Seizure and Searches of Mr. Batista's Cell Phones*

During the interview, when Mr. Batista was not referencing his cell phones, those phones sat in plain view on the center console of the DEA vehicle. Supp. ROA, Vol. 1, at 80. At the end of the interview, SA Epp asked Mr. Batista for consent to search his cell phones, which Mr. Batista denied. *Id*. at 77. SA Epp then seized Mr. Batista's cell phones and allowed Mr. Batista to leave the scene. *Id*. SA Epp testified that while he believed he had probable cause to arrest Mr. Batista at that time for his involvement with the Del City conversion lab, he wanted to build a stronger case and identify other coconspirators. *Id*.

Later that day,[4] SA Epp applied for and received a state search warrant for the contents of Mr. Batista's cell phones. ROA, Vol. 1 at 99–104. A search of those phones uncovered messages, photos, and videos tying Mr. Batista to the Del City conversion lab much more than he

---

Oklahoma City boss for the drug trafficking organization." Supp. ROA, Vol. 1, at 82.

[4]    The interview ended at 12:34 a.m. on July 26, 2022.  ROA, Vol. 1, at 155, 159. The search warrant affidavit was signed on July 26, 2022 at 1:45 p.m. *Id*. at 103.

described in his post-*Miranda* interview. *See* ROA, Vol. 3, at 136–172.

Months later, on December 2, 2022, DEA SA Tyler Rawdon applied for

and received a federal search warrant for historic cell phone location

data associated with Mr. Batista's cell phone during the time the Del

City conversion lab was active. ROA, Vol. 1, at 105–17. That data, as

testified to by Federal Bureau of Investigation SA Andrew Kerstetter,

further confirmed the prosecution theory that Mr. Batista lived and

worked in the conversion lab from the time he arrived in Oklahoma

until that lab caught fire. *See* ROA, Vol. 3 at 453, 477–79.

## II.    Procedural History

<u>*Pre-trial Proceedings*</u>

On September 6, 2022, a grand jury returned an Indictment

charging Mr. Batista and five codefendants with engaging in a drug

conspiracy involving more than 500 grams of methamphetamine. ROA,

Vol. 1, at 12–14. On December 28, 2022, Mr. Batista filed a suppression

motion. *Id*. at 33–53. Among other things, that motion argued that the

July 25 traffic stop was unlawfully extended, that Mr. Batista's cell

phones were unlawfully seized, and that state and federal search

warrants for cell phone content and data were unsupported by both

probable cause and good faith. *Id.* at 50–52.

The government responded in opposition to Mr. Batista's motion and the district court held a suppression hearing on February 2, 2023. *Id.* at 67–162. During the hearing, the United States called Trooper Shores as well as Special Agents Epp and Rawdon. Supp. ROA, Vol. 1, at 11. Following testimony and argument, the district court denied Mr. Batista's suppression motion. Supp. ROA, Vol. 1, at 183.

<u>*Trial*</u>

At trial, the United States relied, in part, on evidence from Mr. Batista's cell phones to support its theory that Mr. Batista and his codefendants worked together in the Del City conversion lab from the time Messrs. Batista and Marrero arrived in Oklahoma together until the lab burned down approximately two weeks later. *See* ROA, Vol. 3, at 136–172. The United States presented evidence that DEA agents recovered approximately 700 grams of crystal methamphetamine and 300 pounds of liquid methamphetamine from the burned Del City lab. *See* ROA, Vol. 3, at 63–65.

After a three-day trial, the jury returned a guilty verdict on February 17, 2023. ROA, Vol. 1, at 281. While the jury convicted Mr.

Batista of engaging in the charged drug conspiracy, it found that the

United States had not proven beyond a reasonable doubt that the

conspiracy involved 50 grams or more of methamphetamine. ROA, Vol.

1, at 282–83.

*Sentencing*

Based on the jury's verdict, Mr. Batista faced a statutory

imprisonment range capped at 20 years. ROA, Vol. 2, at 109 (¶ 114)

(citing 21 U.S.C. § 841(b)(1)(C)). In calculating the guideline range, the

probation officer recommended holding Mr. Batista accountable for over

127 kilograms of liquid methamphetamine and 693 grams of Ice as well

as applying enhancements for importing methamphetamine,

maintaining a drug involved premises, operating a dangerous

methamphetamine lab, functioning as a leader/organizer, and

obstructing justice. *Id.* at 85–87 (¶¶ 31, 37, 38, 39, 41, 42). This resulted

in a total offense level of 49, which was treated as offense level 43. *Id.* at

87 (¶¶ 43, 46) Mr. Batista boasted 20 criminal history points resulting

him being a category VI. *Id.* at 101 (¶ 72). While a total offense level of

43 and criminal history category of VI would normally result in a

guideline of life, the 20-year statutory cap resulted in a guideline range

of 20 years. *Id*. at 109 (¶ 115). Mr. Batista objected to the calculation of the guideline range, including to the base offense level, arguing that his base offense level should have been constrained by the jury's finding of less than 50 grams. *Id*. at 113–17.

After hearing argument from counsel, the district court overruled Mr. Batista's objection to the base offense level. ROA, Vol. 3, at 692. It concluded that Mr. Batista's guideline range was 240 months' imprisonment. *Id*. at 708. After considering the sentencing factors, the arguments of counsel, and Mr. Batista's allocution, the district court sentenced him to 240 months' imprisonment. ROA, Vol 1, at 464. Mr. Batista filed a timely notice of appeal. ROA, Vol. 1, at 470.

## Summary of the Argument

Mr. Batista argues, as he did below, that the July 25 traffic stop was unlawfully extended. But the extension of that traffic stop was supported by both reasonable suspicion of additional criminal activity and Mr. Batista's consent to allow a search of his SUV and to participate in an interview with DEA agents. Mr. Batista fails to address how probable cause could have existed to support his arrest on multiple charges but not to extend a traffic stop.

Mr. Batista also argues that his cell phones were unlawfully seized and that search warrants authorizing the search of those devices and related data were unsupported by probable cause and good faith. But seizure of Mr. Batista's cell phones is supported by probable cause, exigent circumstances, and the plain view doctrine. Mr. Batista's arguments related to the search warrant affidavits should be deemed waived due to his failure to adequately develop those arguments. Even if not waived, the challenged warrants were supported by both probable cause and good faith.

Lastly, Mr. Batista cites Ninth Circuit precedent to argue that the district court improperly held him accountable for a greater drug weight than the jury's verdict. Mr. Batista's argument has been repeatedly rejected in this Circuit and should be rejected again here.

## Argument

### I.   The district court correctly rejected Mr. Batista's suppression motions.

#### A.    Standard of Review.

"When reviewing the denial of a motion to suppress, we view the evidence in the light most favorable to the government, accept the district court's findings of fact unless they are clearly erroneous, and

13

review de novo the ultimate question of reasonableness under the Fourth Amendment." *United States v. Mayville*, 955 F.3d 825, 829 (10th Cir. 2020) (quoting *United States v. McNeal*, 862 F.3d 1057, 1061 (10th Cir. 2017)).

### B.    The Duration of the Traffic Stop.

After making a traffic stop, officers may extend the stop to detect evidence of further criminal wrongdoing if separate reasonable suspicion exists to justify further investigation. *Mayville*, 955 F.3d at 830. The evidence from SA Epp implicating Mr. Batista in a drug conspiracy supports the traffic stop's extension. *See United States v. Pickel*, 863 F.3d 1240, 1249 (10th Cir. 2017) (applying collective knowledge doctrine to justify a stop, extension of the stop, and search of the car). This evidence included SA Epp's knowledge: (1) that photo IDs belonging to Batista were found in a large methamphetamine lab 11 days before the traffic stop; (2) that Batista recently spent time in Oklahoma with other men connected to that lab; and (3) that Batista conducted what appeared to be a drug transaction[5] immediately before

---

[5]    While officers later learned that the bag Mr. Batista obtained from the Ram and placed in his SUV only contained clothing, his short meeting

the traffic stop. *See* ROA, Vol. 1, at 80–81.

Further, once Trooper Shores stopped Mr. Batista, he noticed the odor of marijuana and learned that Mr. Batista was driving without a valid license. *See* Supp. ROA, Vol. 1, at 32. This alone justifies an extension of the stop and search of the SUV. *See United States v. Snyder*, 793 F.3d 1241, 1244 (10th Cir. 2015) ("Our cases establish that the smell of burnt marijuana alone establishes probable cause to search a vehicle for the illegal substance.").

While either the evidence possessed by SA Epp or the odor and presence of marijuana detected by Trooper Shores supported an extension of the stop and search of the SUV, together, the evidence far exceeded the requirements of the Fourth Amendment. *See Latorre*, 893 F.3d at 751; *United States v. Loucks*, 806 F.2d 208, 211 (10th Cir. 1986) (concluding that the presence of a user quantity of marijuana in the passenger compartment of a car justifies a search of the entire car). The probable cause to search the SUV necessarily justifies a significant

---

and exchange of items nonetheless contributes to the probable cause for the extension of the traffic stop. *See United States v. Sokolow*, 490 U.S. 1, 10 (1989) (citing *United States v. Gates*, 462 U.S. 213 (1983)) ("innocent behavior will frequently provide the basis for a showing of probable cause").

extension of the stop to allow for a thorough search of the SUV. *See United States v. Parada*, 577 F.3d 1275, 1283 (10th Cir. 2009) (explaining that probable cause to search a vehicle "justifies a search of every part of the vehicle and its contents that may conceal the object of the search."). Further, while Mr. Batista complains about the duration of the stop, he gave officers consent to search the SUV only eight minutes into the traffic stop and later agreed to roadside post-*Miranda* questioning by DEA agents. *See* Supp. ROA, Vol. 1, at 75. Thus, the reasonableness of the duration of the traffic stop is also supported by Mr. Batista's consent. *See United States v. Carbajal-Iriarte*, 586 F.3d 795, 802 (10th Cir. 2009) (concluding that a two-hour vehicle search was not unreasonable because defendant gave general consent to allow officers to search the car).

### C.    The Seizure of Mr. Batista's Cell Phones.

A law enforcement officer may seize a cell phone without a warrant if the officer has probable cause to believe that the phone contains incriminating evidence and exigent circumstances exist. *Andersen v. DelCore*, 79 F.4th 1153, 1166 (10th Cir. 2023) (citing *United States v. Place*, 462 U.S. 699, 701 (1983)). Under *Place*, "where law

enforcement authorities have probable cause to believe that a container

holds contraband or evidence of a crime, but have not secured a

warrant, the Court has interpreted the Amendment to permit seizure of

the property, pending issuance of a warrant to examine its contents, if

the exigencies of the circumstances demand it or some other recognized

exception to the warrant requirement is present." *Id*. at 701.

Here, when they seized Mr. Batista's cell phones, DEA agents

knew: (1) that Mr. Batista was involved in an ongoing drug conspiracy

and had been for over one week; (2) that Mr. Batista spent time with

other coconspirators during that time; (3) that Mr. Batista

communicated with at least one of those coconspirators via phone; (4)

that Mr. Batista used his cell phone to receive money; (5) that Mr.

Batista possessed two cell phones despite no apparent legitimate

employment; and (6) that drug traffickers generally use cell phones to

conduct their business. *See* ROA, Vol. 1, at 101–02. Further, DEA

agents knew that Mr. Batista had just provided a partially

incriminating statement riddled with inconsistencies. *See id*. at 155–59.

During that statement, Mr. Batista repeatedly referenced information

from his cell phone. *See* Supp. ROA, Vol. 1, at 175.

17

Based on the facts known to DEA agents when they seized Mr.

Batista's cell phones, the likely evidentiary value of those cell phones—

recognized tools of the drug trade for over 30 years in the Tenth

Circuit—far exceeded the requirements of probable cause. S*ee generally

United States v. Slater*, 971 F.2d 626, 637 (10th Cir. 1992) (identifying

cell phones as a "recognized tool of the drug trade").

Warrantless seizures of cell phones have also been analyzed under

the related doctrine of plain view. *See United States v. Babilonia*, 854

F.3d 163, 180–82 (2nd Cir. 2017). Under that doctrine, officers may

seize an item in plain view if: (1) officers are lawfully located in a place

from which to plainly view the item; (2) officers have a lawful right of

access to that item; and (3) the incriminating nature of the item is

apparent on its face. *Horton v. California*, 496 U.S. 128, 136–37 (1990).

Here, based on the facts known to DEA agents at the time of the

seizure, that seizure satisfies the requirements of *Horton* for largely the

same reasons that it satisfies the probable cause required by *Place*.

### D.    The Search Warrants for Cell Phone Data.

Mr. Batista asserts a boilerplate challenge to the sufficiency of the

probable cause in a state and federal search warrant seeking data from

his cell phones and location data from his cell phone provider, respectively. Aplt. Br. at 36. Mr. Batista's only support for his contention is to misstate the content of the affidavits supporting those warrants and to cite one case, which he claims stands for the opposite of what it says. Compare *United States v. Leon*, 468 U.S. 897, 926 (1984) (concluding that suppression was inappropriate despite a warrant lacking probable cause because officer relied on the magistrate's determination that good faith existed), with Aplt. Br. at 36 (citing *Leon* for the claim that "[t]he absence of probable cause to seize and search the cell phones vitiates any reliance on the good faith exception.").

> **1.    Mr. Batista's inadequate briefing of his claim regarding the sufficiency of the search warrant affidavits waives those arguments.**

"This court will not consider . . . 'issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation.'" *United States v. Wooten*, 377 F.3d 1134, 1145 (10th Cir. 2004) (quoting *Murrell v. Shalala*, 43 F.3d 1388, 1390 n.2 (10th Cir. 1994)).

Here, Mr. Batista asserts that the "affidavits in support of these warrants simply state, in essence, that because Mr. Batista was

suspected of being part of a drug ring, and had cellular telephones, there must of necessity be relevant evidence on the phones[,]" which he says, "amounts to no more than speculation by tautological reasoning." Aplt. Br. at 36. But Mr. Batista mischaracterizes the affidavits. The state court warrant seeking to search the content of Mr. Batista's cell phones contains a probable cause section consisting of ten paragraphs of information detailing Mr. Batista's involvement in an ongoing drug conspiracy and tying that conspiracy to cell phone activity. *See* ROA, Vol. 1, at 101–02. The federal warrant seeking historic cell phone location data contains a similar probable cause section that spans four pages detailing similar information. *See id.* at 108–12. Mr. Batista's cursory effort to develop his argument amounts to a waiver of that argument.

> **2.      Even if Mr. Batista's arguments are not waived, both warrants are supported by probable cause.**

An affidavit in support of a search warrant must "contain facts sufficient to lead a prudent person to believe that a search would uncover contraband or evidence of criminal activity." *United States v. Edwards*, 813 F.3d 953, 960 (10th Cir. 2015) (quoting *United States v. Danhauer*, 229 F.3d 1002, 1006 (10th Cir. 2000)). If a defendant later

challenges the validity of a search warrant, the reviewing court should "resolve 'doubtful or marginal cases' by deferring to a magistrate judge's determination of probable cause." *United States v. Biglow*, 562 F.3d 1272, 1282 (10th Cir. 2009) (quoting *Massachusetts v. Upton*, 466 U.S. 727, 734 (1984)).

Here, the state search warrant affidavit is five pages, mostly single-spaced and sworn to by SA Epp. ROA, Vol. 1, at 99–102. In that affidavit SA Epp describes his knowledge of the general relationship between drug traffickers and cell phones, his knowledge of Mr. Batista's involvement in a drug conspiracy, and information from Mr. Batista's post-*Miranda* interview indicating that the cell phones likely contained evidence of a drug conspiracy. *See id*. Under the totality of the circumstances, the affidavit accompanying the state warrant establishes probable cause to support the search of Mr. Batista's cell phones. *See Biglow*, 562 F.3d at 1281 (quoting *New York v. P.J. Video, Inc.*, 475 U.S. 868, 877–78 (1986)) (stating that probable cause only requires a "probability" or "substantial chance" of obtaining evidence of criminal activity, not "an actual showing.").

Similarly, SA Rawdon's federal warrant seeking location data

from Mr. Batista's service provider provided similar information to the state warrant. *See* ROA, Vol. 1, at 99–12. Like the state warrant, the federal warrant detailed why the data would likely be of evidentiary value and tied that data to the criminal activity. *Id.* Thus, the warrant for historic cell phone location data was supported by probable cause.

> **3.  Even if one of the warrants lacks probable cause, DEA agents relied on those warrants in good faith.**

Even if probable cause does not support a warrant, the search will still be valid "if the executing officer acted with an objective good-faith belief" in the validity of the warrant. *Edwards*, 813 F.3d at 970. "Reliance upon a warrant issued by a neutral magistrate creates a 'presumption ... [that] the officer is acting in good faith.'" *United States v. Chambers*, 882 F.3d 1305, 1310 (10th Cir. 2018) (quoting *United States v. Cardall*, 773 F.2d 1128, 1133 (10th Cir. 1985)). Under the good faith exception, an "affidavit has enough factual support to justify reliance if it establishes a minimally sufficient nexus between the illegal activity and the place to be searched." *United States v. Henderson*, 595 F.3d 1198, 1202 (10th Cir. 2010) (brackets and quotation marks omitted).

Here, even if one of the warrants lacked probable cause, both warrants contained at least an "indicia" of probable cause and established the "minimally sufficient nexus" required under the good faith exception. *See Henderson*, 595 F.3d at 1202.

## II. The district court did not abuse its discretion in sentencing Mr. Batista.

### A. The ultimate standard of review is abuse of discretion.

Proper calculation of the guidelines is a question of procedural reasonableness, which this court reviews for an abuse of discretion. *United States v. White*, 782 F.3d 1118, 1129 (10th Cir. 2015). Legal errors are reviewed de novo, because "[a] district court by definition abuses its discretion when it makes an error of law." *Koon v. United States*, 518 U.S. 81, 100 (1996). But this court "accept[s] the finding of facts of the district court unless they are clearly erroneous." 18 U.S.C. § 3742(e); *United States v. Finnesy*, 953 F.3d 675, 688 (10th Cir. 2020).

### B. This district court correctly attributed more than 50 grams of methamphetamine to Mr. Batista.

At trial, the jury returned a guilty verdict against Mr. Batista as to the conspiracy alleged in the Indictment. ROA, Vol. 1, at 281. But the jury concluded that less than 50 grams of methamphetamine was

attributable to Mr. Batista under a beyond-a-reasonable-doubt
standard. *Id.* at 282–83.

For purposes of sentencing, the PSR recommended holding Mr.
Batista accountable for 267,874 kilograms of converted drug weight,
which included over 127 kilograms of liquid methamphetamine and 593
grams of "Ice." ROA, Vol. 2, at 85 (¶ 31). Mr. Batista objected, arguing
that the district court should limit its sentencing findings to the less
than 50 grams found by the jury. *Id.* at 113–17 (citing *United States v.
Pimentel-Lopez*, 859 F.3d 1134, 1141–43 (9th Cir. 2016)). Mr. Batista
cited the contrary Tenth Circuit authority from *United States v.
Magallanez* but attempted to distinguish *Magallanez. Id.* at 116 (citing
408 F.3d 672, 685 (10th Cir. 2005)). In light of binding Tenth Circuit
precedent, the district court overruled Mr. Batista's objection. *See* ROA,
Vol. 3, at 692.

On appeal, Mr. Batista raises the same argument. Aplt. Br. at 18–
28. But his problem remains, *Magallanez* still forecloses his argument.
*United States v. Gunn*, No. 21-6168, 2023 WL 2808109, at *16 (10th Cir.
Apr. 6, 2023); *United States v. Keck*, 643 F.3d 789, 798 (10th Cir. 2011).
And because *Magallanez* is a published opinion, it is binding on this

court absent en banc reconsideration or intervening Supreme Court precedent. *In re Smith*, 10 F.3d 723, 724 (10th Cir. 1993) (per curiam).

Mr. Batista asks this court to distinguish *Magallanez* by saying it did not directly address the claim the district court was precluded from making a contradictory finding because the jury made an affirmative finding of the drug quantities involved. Aplt. Br. at 23–25 (quoting *Pimentel-Lopez*, 859 F.3d at 1177). But he misreads *Magallanez*. There, this Court recognized that the jury had made an affirmative finding that "50-500 grams of methamphetamine" was attributable to the defendant. *Magallanez*, 408 F.3d at 676. It rejected the argument that the district court erred by attributing 1,200 grams of methamphetamine to the defendant for purposes of sentencing because "sentencing courts maintain[] the power to consider the broad context of a defendant's conduct, even when a court's view of the conduct conflict[s] with the jury's view." *Id*. at 684.

After urging this Court to distinguish *Magallanez*, Mr. Batista goes on to ask it to disregard *Gunn*, a recent unpublished case on point to the issue here. Aplt. Br. at 27. While *Gunn* is not binding, it applies *Magallanez* and reaches the same conclusion the government urges

here. *See Gunn*, 2023 WL 2808109, at *16 ("Applying *Magallanez* here, the district court wasn't forced to accept the jury's finding that Gunn was liable for only 50 to 500 grams of methamphetamine; it could independently decide the drug quantity at sentencing."). For the same reasons the court rejected the appellant's arguments in *Gunn*, it should reject Mr. Batista's arguments here.

As for Mr. Batista's constitutional arguments, they too are foreclosed by this Court's precedent.  In *United States v. Cassius*, the district court "calculated Defendant's statutory sentencing range (0 to 30 years) based on the jury's drug quantity finding" and "only used its own drug quantity finding as a mere sentencing factor to help choose a sentence *within* the proper statutory range."  777 F.3d 1093, 1097 (10th Cir. 2015).  This Court explained that "duality is quite permissible."  *Id.* Relying on Supreme Court precedent, this Court explained that what the district court was constitutionally permissible.  *Id.* ("'We have long recognized that broad sentencing discretion, informed by judicial factfinding, does not violate the Sixth Amendment.'" (quoting *Alleyne v. United States*, 570 U.S. 99, 116 (2013)); *see also United States v. Booker*, 543 U.S. 220, 233 (2005) ("[W]hen a trial judge exercises his discretion

to select a specific sentence within a defined range, the defendant has

no right to a jury determination on the facts that the judge deems

relevant.").

## Conclusion

For these reasons, this Court should affirm the judgment and

sentence of the district court.

Respectfully submitted,

ROBERT J. TROESTER
United States Attorney


<u>s/ TRAVIS LEVERETT</u>
Assistant United States Attorney
Bar Number: TX 24106200
210 Park Avenue, Suite 400
Oklahoma City, Oklahoma 73102
(405) 553-8700 (Office)
(405) 553-8888 (Fax)
Travis.Leverett@usdoj.gov

**Certificate of Compliance with Type-Volume Limitation,
<u>Typeface Requirements, and Type Style Requirements</u>**

As required by Fed. R. App. P. 32(g), I certify that this brief is proportionally spaced and contains 5318 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).  I relied on my word processor to obtain the count and it is:  Microsoft Word 365.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook.

I certify that the information on this form is true and correct to the best of my knowledge and belief formed after a reasonable inquiry.

<u>s/ TRAVIS LEVERETT</u>
Assistant U.S. Attorney